**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.: 20-cv-2531**

| | |
|---|---|
| John Gary Lindman,<br><br>               Plaintiff,<br>v.<br><br>Wells Fargo Bank, N.A., Macy's Inc., TD Bank USA, N.A., and Equifax Information Services LLC,<br><br>               Defendants. | <u>**COMPLAINT**</u><br><br><u>**JURY TRIAL DEMANDED**</u> |

## <u>INTRODUCTION</u>

1.     This action arises out of Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

## <u>JURISDICTION</u>

2.     Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the conduct at issue occurred in this District, Plaintiff resides in this District, and Defendants conducts business in this District.

## <u>PARTIES</u>

4.     Plaintiff, John Gary Lindman (hereinafter "Plaintiff"), is a natural person who resides in the County of Sherburne, State of Minnesota, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

1

5.      Defendant, Wells Fargo Bank, National Association (hereinafter "Defendant WF"), is a national bank that is licensed to do business in the State of Minnesota and regularly conducts business in said State. Defendant WF has a principal place of business located at 420 Montgomery Street, San Francisco, CA 94104.  Defendant WF is a "person" as defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

6.      Defendant, Macys, Inc. (hereinafter "Defendant Macys"), is a national retail store that is licensed to do business in the State of Minnesota and regularly conducts business in said State. Defendant Macys has headquarters located at 151 West 34th St., New York, NY  10001 and has a registered agent for service of Corporation Creations Network Inc., 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, DE  19810.  Defendant Macys is a "person" as defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

7.      Defendant, TD Bank USA, National Association (hereinafter "Defendant TD Bank"), is a national bank that is licensed to do business in the State of Minnesota and regularly conducts business in said State. Defendant TD Bank has a principal place of business located at 2035 Limestone Road, Wilmington, DE  19801.  Defendant TD Bank is a "person" as defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

8.      Defendant Equifax Information Services LLC (hereinafter "Defendant Equifax") is a foreign limited liability company organized under the laws of the state of Georgia; is authorized to do business in the state of Minnesota and regularly conducts business within

2

said State; and has a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309. Defendant is a "consumer credit reporting agency," as defined by 15 U.S.C. § 1681a(f) regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing "consumer reports," as defined by 15 U.S.C. § 1681a(d), to third parties.

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

9.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

10.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information...." 15 U.S.C. 1681(b).

11.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. 1681e(b).

12.     Defendant Equifax regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors and others.

13.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

14.     Defendant Equifax collects information from thousands of furnishers.

15.     The process by which Defendant Equifax receives, sorts, and stores information is largely electronic.

16.     Furnishers report credit information to Defendant Equifax through the use of coded tapes that are transmitted to Defendant Equifax on a monthly basis through software known as Metro 2.

17.      Defendant Equifax takes the credit information reported by furnishers and creates consumer credit files.

18.     Defendant Equifax maintains credit files on more than 200 million consumers.

19.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to as "tradelines" within the industry).

20.     Defendant Equifax knows that different consumers can have similar names.

21.     Defendant Equifax knows that different consumers can have similar social security numbers.

22.     Defendant Equifax knows that different consumers with similar names can also have similar social security numbers.

23.     Defendant Equifax matches tradelines to a consumer credit file by comparing the information about the consumer associated with the tradeline to the information Defendant Equifax maintains about the consumer in the consumer's credit file or files.

24.     Defendant Equifax accomplishes this matching of credit information to consumer credit files using certain matching algorithms or database rules.

25.     Sometimes Defendant Equifax's matching algorithms match information belonging to one consumer to the credit file of another consumer.

26.      resulting in what is commonly known in the industry as a mixed or merged credit file.

27.     A mixed or merged credit file is the result of Defendant Equifax inaccurately merging of credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

28.     There are many different possible causes for the merging of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Defendant Equifax to match credit information, including bankruptcy filing information, to a particular consumer's credit file.

29.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant Equifax.

30.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal or "indicative" information (e.g., name, social security number, address, date of birth, etc.) by the furnishers to Defendant Equifax.

31.     These rules also determine which credit files are merged to create a complete consumer report.

32.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

33.    Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general.  Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions.  Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (2nd ed. 2006).

34.    Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.  15 U.S.C. § 1681(a)(1).

35.    The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy."  *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

36.    The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act.  Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record.  Anthony Rodriguez et al.,

FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

37.     Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information.    Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

38.     Congress considered inaccurate and misleading information to be the most serious problem.  Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

39.     The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected.  Anthony Rodriguez et al., FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

40.     An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness, but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed.  Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

41.     Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act.  The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the

handling of consumer disputes.  These provisions were originally scheduled to sunset in 2003, but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003.  Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92.  Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf.

42.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes.  *See* 15 U.S.C. § 1681i(a)(5)(D).

43.    Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance.  e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

44.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

45.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

46.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Credit Dispute Verification ("ACDV") electronic form.

47.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

48.     These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

## FACTUAL ALLEGATIONS

49.     Plaintiff John Gary Lindman and his brother James Peter Lindman (hereinafter "James Lindman")(hereinafter collectively ""Lindman brothers") credit files were mixed by Defendant Equifax several years ago prior to 2002.

50.     The Lindman brothers have different employers, have separate social security numbers, different dates and years of birth, and have not lived at the same address in Plymouth, Minnesota since 2001.

51.     Plaintiff had notified Equifax in 2002 that his credit report was being mixed with that of his brother James when he was attempting to purchase his first home.

52.     Plaintiff wrote to Equifax and called it to ensure that his credit file was separate from that of his younger brother.

53.     In December of 2019 Plaintiff obtained a copy of his Equifax credit report and discovered that Defendant Equifax was again inaccurately reporting his brother's personal identifying and credit account information on Plaintiff's report, including James's name, birth date, social security number, and several of his financial accounts, including the accounts in question in violation of 15 U.S.C. §1681e.

54.    Defendant Equifax had been selling Plaintiff's credit information to various entities who it should have known did not have a permissible purpose as each were providing personal information related to James Lindman and not Plaintiff's in violation of 15 U.S.C. §1681b.

55.    Further, Defendant Equifax also sold credit reports containing inaccurate information concerning James Lindman to potential and current creditors of Plaintiff in violation of 15 U.S.C. §1681e.

56.    In December of 2019 Plaintiff was attempting to purchase a new vehicle.

57.    Plaintiff visited Chevrolet of Wayzata and completed a credit application and the dealership shopped for financing on his behalf and as a result several lenders, including Chevrolet of Wayzata purchased Plaintiff's credit report from Defendant Equifax.

58.    Plaintiff's Equifax credit report contained numerous errors and false information that did not belong to Plaintiff in violation of 15 U.S.C. §1681e.

59.    Plaintiff felt despair and was embarrassment, humiliated, frustrated and angry when he denied his anticipated car loan by Fifth Third Bank on December 14, 2019, GM Financial on February 2, 2020, Citizens One Auto Finance on January 4, 2020, Spire Credit Union on December 15, 2019, and Huntington National Bank on December 21, 2019.

60.    Plaintiff first called Defendant Equifax via telephone and warned them of Plaintiff's brother's information being on his credit report.

61.    Defendant Equifax refused and failed to investigate Plaintiff's dispute and instead told him it could only respond to dispute letter sent in the mail.

62.    Defendant Equifax conduct in refusing to investigate in response to Plaintiff's telephone dispute violates 15 U.S.C. §1681i.

10

63.     On December 31, 2019, Plaintiff sent a dispute letter to Equifax, which stated, in

relevant part:

> ...
> *For some reason on MY CREDIT report when I typed in MY social security number it came up with my brother's name:*
>
> **James Lindman (disputing name)**
>
> *It also states that one of my jobs has been to work at:*
>
> **Lindman plumbing (disputing job / this is my brothers job)**
>
> *The credit report also has several accounts that do not belong to me, but in fact belong to my brother, James Lindman:*
>
> **2.8 Macy's/DSNB Balance $0**
> **2.9 BestBuy/CBNA (Balance $0/Available Credit $2000)**
> **2.10 Wells Fargo Card Services Balance of $9,202**
> **2.12 TDBank USA/Target Credit (Available Credit $1500)**
> **2.13 KOHLS/Capital One (Available Credit $1000)**
> **2.16 THD/CBNA (Balance $328/Available Credit $5000)**
> **2.17 Wells Fargo Services balance of $3,272**
> **4.2 Wells Fargo DLR svc/wach DLS balance of $34,642. Account ends in 8193**
> **4.3 East Wisconsin Savings Bank balance of $4,414. Account ends in 3247**
>
> *My brother and I have almost identical social security numbers. His information on my credit report has caused me to be **denied from several places** for an auto loan. I would appreciate that this information be corrected as soon as possible.*
>
> ...
>
> **Emphasis added**

64.     Plaintiff's letter included his name, address, and birthdate. Plaintiff sent a copy of his

driver's license and a copy of a utility bill with the dispute.

65.     Defendant Equifax never contacted Plaintiff to gain more information from him

despite Plaintiff including his telephone number.

66.     Thereafter Defendant Equifax forwarded Plaintiff's dispute information to the various creditors and co-Defendants identified in paragraphs 5-8 above for investigation as required by 15 U.S.C. § 1681(a)(2).

67.     Defendant Equifax failed to conduct a reasonable investigation in response to Plaintiff's December 2019 dispute letter, in violation of 15 U.S.C. §1681i, as it, first, failed to recognize the mixed file situation, second failed to delete all of the disputed accounts and third failed to investigate the inquiries that it knew or should have known were not associated with Plaintiff but instead with his brother, James Lindman.

68.     Upon information and belief, Defendant WF, failed to conduct a reasonable investigation into the accounts, in violation of 15 U.S.C. §1681s-2(b).

69.     Defendant WF incorrectly verified for Defendant Equifax that account number 446542029887XXXX belonged to Plaintiff and was accurately reporting on his credit report, in violation of 15 U.S.C. § 1681s-2(b).   Defendant WF's reporting adversely affected Plaintiff's credit profile.

70.     Upon information and belief, Defendant Macys, failed to conduct a reasonable investigation into the accounts, in violation of 15 U.S.C. §1681s-2(b).

71.     Defendant Macys incorrectly verified for Defendant Equifax that account number 42303007*** belonged to Plaintiff and was accurately reporting on his credit report, in violation of 15 U.S.C. § 1681s-2(b).   Defendant Macys' reporting adversely affected Plaintiff's credit profile.

72.     Upon information and belief, Defendant TD Bank, failed to conduct a reasonable investigation into the accounts, in violation of 15 U.S.C. §1681s-2(b).

73.     Defendant TD Bank incorrectly verified for Defendant Equifax that account number 585975213607*** belonged to Plaintiff and was accurately reporting on his credit report, in violation of 15 U.S.C. § 1681s-2(b).  Defendant TD Bank's reporting adversely affected Plaintiff's credit profile.

74.     Defendants WF, Macys and TD Bank all received an electronic communication from Defendant Equifax as well as the additional proof documents submitted by Plaintiff.

75.     Defendants WF, Macys and TD Bank all failed to conduct a reasonable investigation in violation of 15 U.S.C. §1681s-2(b) and also and failed to update and/or remove the accounts or in the alternative, to report the accounts as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to Defendant Equifax that the alleged accounts belonged to Plaintiff and were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

76.     Defendant Equifax then mailed to Plaintiff its investigation results dated January 31, 2020 but addressed the results to Plaintiff's brother, James Lindman.

77.     Defendant Equifax provided confusing and contradictor conclusion in the January 31, 2020 investigation results including but not limited to the following:

  a)     Defendant Equifax believed Plaintiff that he did not work for Lindman Plumbing and deleted it from his file.
  b)     Defendant Equifax didn't believe that Plaintiff's social security number was different from his brother James and refused to change it.
  c)     Defendant Equifax did believe that Plaintiff did not have over 5 accounts with Wells Faro EFS all bearing the account number 166550982203* and deleted them.
  d)     Defendant Equifax did not believe that Plaintiff had not opened a TD Bank USA/Target Credit account and refused to delete it.
  e)     Defendant Equifax did believe that Plaintiff did not have a Kohls/Capital One account number 63905087668* and deleted it from his file.

13

f)   Defendant Equifax did believe that Plaintiff did not have a THD/CBNA account 60535019555* and deleted it from his file.

g)   Defendant Equifax did believe that Plaintiff did not have a THD/CBNA account 603532092881* and deleted it from his file.

h)   Defendant Equifax did believe that Plaintiff did not have a THD/CBNA account 603532086289* and deleted it from his file.

i)   Defendant Equifax did not believe that Plaintiff had not opened the Wells Fargo Dealer Service account and refused to delete this account showing that Plaintiff owed $34,642.

j)   Defendant Equifax did not believe that Plaintiff had not opened the Macys/Dsnb account and refused to delete it from his file.

k)   Defendant Equifax did not believe that Plaintiff had not opened the Wells Fargo Card Services account showing that Plaintiff owed $3815 and refused to delete it.

l)   Defendant Equifax did believe that Plaintiff did not open the Wells Fargo Bank NA account 577442199141* and deleted it from his file.

m)   Defendant Equifax misrepresented to Plaintiff that East Wisconsin Savings Bank account was not on his credit file when it fact it was.

78.   Plaintiff was distraught over Defendants' failures to agree to remove accounts that clearly were not his yet were still appearing on his Defendant Equifax credit report.

79.   On February 17, 2020, Plaintiff sent a second dispute letter to Equifax, which stated, in relevant part:

*The following information is <u>Not</u> mine:*

*<u>James Lindman (disputing name)</u>*

*<u>Birth date 4-3-1978 (disputing birthdate)</u>*

*The credit report still has several accounts that do not belong to me, but in fact belong to my brother, James Lindman:...<u>Acct #446542029887 Wells Fargo Services balance of $3,272</u>... My brother and I have almost identical social security numbers. His information on my credit report has caused me to be <u>denied from several places</u> for an auto loan. I would appreciate that this information be corrected as soon as possible.*

14

80.    To verify his identity, Plaintiff's letter included his name, birth date, and social security number. Plaintiff included a copy of his driver's license and social security card with the dispute.

81.    Thereafter, Defendant Equifax either forwarded Plaintiff's dispute information to Defendants WF, Macys and TD Bank for investigation as required by 15 U.S.C. § 1681(a)(2) or Defendant Equifax determined on its own that the aforementioned accounts this time did not belong to Plaintiff and deleted them without notifying each of the creditors.

82.    However, Defendant Equifax failed to investigate Plaintiff's dispute concerning the Defendant WF / Wells Fargo Card Services account in violation of 15 U.S.C §1681i.

83.    Defendant Equifax then caused to be mailed to Plaintiff its investigation results dated March 5, 2020.

84.    Defendant Equifax investigation results showed that this time it believed Plaintiff and removed three of the four remaining accounts but failed to investigate the Defendant WF / Wells Fargo Card Services account.

85.    Further, Defendant Equifax finally removed the name James Lindman and James Lindman's date of birth from his credit report.

86.    Plaintiff was relieved that some of the misinformation had been finally removed from his Defendant Equifax credit report but was still angry, frustrated, anxious and worried that the remaining Defendant WF account was still present.

87.    Further, Plaintiff was still suffering from emotional distress and mental anguish concerning Defendant Equifax continuing to mix his file with that of his brother James Lindman.

88.     Plaintiff applied for a boat loan with Marine Max on or about May 2, 2020 and was

denied credit by First Premier Bank on May 2, 2020 and Huntington National Bank on May

12, 2020 due to his Defendant Equifax credit report still containing erroneous and adverse

information.

89.     In late September 2020 Plaintiff again sent a dispute letter to Defendant Equifax,

which stated, in relevant part:

> *There remain serious errors on my credit report that must be corrected as they are causing me problems on obtaining credit and they are negatively affecting my credit score.*
>
> *The trade line referencing Wells Fargo Card Services, account number 446542029887, is not my account.*
>
> *The trade line referencing Royal Credit Union, account number xxxxxx6909, is not my account and needs to be removed from my credit report.*
>
> *The trade line referencing Sears/CBNA, opened on October 11, 2015, is not my account and needs to be removed from my credit report.*
>
> *Further you are reporting Personal Information that is wrong. "Formerly known as James P. Lindman." That is not accurate. At no time in my life have I ever been previously known by my brother's name. This information needs to be removed.*

90.     Defendant Equifax followed up this third dispute letter deleting all information

Plaintiff disputed except for the Defendant WF account, in violation of 15 U.S.C §1681i.

91.     Again Plaintiff was relieved that some of the misinformation had been finally removed

from his Defendant Equifax credit report but was still angry, frustrated, anxious and worried

that the remaining Defendant WF account was still present in violation of 15 U.S.C. § 1681s-

2(b).

92.     As a result of Defendants' inaccurate reporting to the credit reporting agencies, Plaintiff has suffered reduced credit, loan denials, emotional distress, embarrassment, frustration, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

93.     Plaintiff is entitled to attorneys' fees and costs from Defendants pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

## TRIAL BY JURY

94.     Plaintiff is entitled to and hereby demands a trial by jury.  U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## CAUSE OF ACTION

### COUNT I.

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT – 15 U.S.C. § 1681 *et seq*. AGAINST DEFENDANTS WF, MACYS AND TD BANK

95.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

96.     Defendants WF, Macys and TD Bank violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it and documentation provided by Plaintiff, and failing to update and/or remove the inaccurate tradelines or, in the alternative, to report the accounts as "disputed" by changing the Metro II CCC (Compliance Condition Codes) Code to "XB."

97.     As a result of Defendants WF, Macys and TD Bank's violations of the FCRA, Plaintiff has suffered actual damages not limited to out-of-pocket expenses, detriment to his credit rating, emotional distress, embarrassment, mental anguish, anxiety, and humiliation in an amount to be determined at trial.

98.     Defendant WF, Macys and TD Bank's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

99.     Alternatively, Defendant WF, Macys and TD Bank's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

100.    Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendants WF, Macys and TD Bank in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II.

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT –
### 15 U.S.C. § 1681 *et seq.*
### AGAINST DEFENDANT EQUIFAX

101.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

102.    For years, and within the two years prior to the filing of this Complaint, Plaintiff repeatedly notified Defendant Equifax that Plaintiff's consumer report contained a wealth of misinformation, likely belonging to Plaintiff's brother, James Lindman.

103.    Plaintiff notified Defendant Equifax which exact information contained within his consumer report was inaccurate.

104.   For years, and within the two years prior to the filing of this Complaint, Plaintiff repeatedly provided Defendant Equifax with the verification of Plaintiff's identity which Defendant Equifax sought.

105.   On December 31, 2019 and again on February 17, 2020, Plaintiff sent Defendant Equifax dispute letters specifying exactly what information contained on his consumer report was inaccurate.

106.   Still, Plaintiff's consumer report continued to contain erroneous information belonging to his brother, James Lindman.

107.   Thus, for years, and within the two years prior to the filing of this Complaint, Defendant Equifax failed to follow reasonable procedures to assure maximum possible accuracy of Plaintiff's consumer report, in willful violation of 15 U.S.C. § 1681e.

108.   Moreover, for years, and within the two years prior to the filing of this Complaint, Defendant Equifax failed to provide Plaintiff copies of his consumer report upon his request and the results of his dispute, in violation of 15 U.S.C. § 1681g.

109.   Finally, Defendant Equifax failed to conduct a reasonable reinvestigation into Plaintiff's dispute submitted on December 31, 2019 and again on February 17, 2020, in violation of 15 U.S.C. § 1681i.

110.   Defendant Equifax's conduct in violation of the FCRA has caused Plaintiff actual damages in the form of immense frustration, anger, hopelessness, anxiety, loss of sleep, mental anguish and emotional distress.

111.   Defendant Equifax's conduct, actions, and inactions were willful, rendering it liable for punitive damages in an amount to be allowed by the Court, pursuant to 15 U.S.C. § 1681n.

112.   Alternatively, Defendant Equifax's conduct, actions, and inactions were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

113.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, and costs and attorney's fees from Defendant Equifax in an amount to be determined by the Court, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants for:

- an award of actual and statutory damages against Defendants for their violations of the FCRA pursuant to 15 U.S.C. §§ 1681n and 1681o;
- an award of punitive damages against Defendants for their willful noncompliance with the FCRA pursuant to 15 U.S.C. § 1681n;
- an award of costs and attorney's fees against Defendants pursuant to 15 U.S.C. §§ 1681n and 1681o; and
- such other and further relief as the Court may deem just and proper.

Dated this 14th day of December 2020.

Respectfully submitted,


By: _s/Thomas J. Lyons Jr_

Thomas J. Lyons, Jr., Esq.
Attorney I.D. #: 249646
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
tommy@consumerjusticecenter.com

Mark L. Vavreck, Esq.
Attorney I.D. #: 0318619
**GONKO & VAVRECK PLLC**
Designers Guild Building
401 North Third Street, Suite 640
Minneapolis, MN 55401
Telephone:  (612) 659-9500
mvavreck@cgmvlaw.com

***ATTORNEYS FOR PLAINTIFF***

## VERIFICATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF

I, John Lindman, declare under penalty of perjury, as provided for by the laws of

the United States, 28 U.S.C. § 1746, that the following statements are true and correct:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.


Dated this 13 day of December, 2020.

          s/John Lindman

          John Lindman